IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DANIEL O. S.,[1]     )
                     )
         Plaintiff,  )
                     )
vs.                  )  Case No. 18-cv-727-CJP[2]
                     )
COMMISSIONER of SOCIAL )
SECURITY,            )
                     )
         Defendant.  )

## **MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff filed an application for disability benefits on December 29, 2013. That application was denied on April 17, 2014. Plaintiff did not file a timely appeal. (Tr. 273). Therefore, plaintiff was conclusively not disabled before April 18, 2014 and must prove that he was disabled after that date. Plaintiff reapplied

---

[1] In keeping with the court's recently adopted practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 19.

for disability benefits in September 2014 and April 2015, alleging disability as of October 15, 2011. After holding an evidentiary hearing, ALJ Louis Aliberti denied the application on April 11, 2017. (Tr. 32-43). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ did not adhere to 20 C.F.R. § 416.927 when he failed to accord adequate weight to the opinions of the claimant's physicians.

2. The ALJ did not adhere to SSR 16-3p when he failed to properly evaluate claimant's subjective symptom allegations.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the

claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Murphy v. Colvin,* 759 F.3d 811, 815 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

ALJ Aliberti followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date.

The ALJ found that plaintiff had severe impairments of inflammatory arthritis, in the form of ankylosing spondylosis (AS), osteoarthritis, and obesity.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the sedentary exertional level with some physical and mental limitations. Based on the testimony of a VE, the ALJ concluded that plaintiff was not able to do his past work, but he was not disabled because he was able to do other jobs which exist in significant numbers in the national economy.

### **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record

is directed to the points raised by plaintiff.

1.  **Agency Forms**

Plaintiff was born in 1969 and was almost 43 years old on the alleged onset date. (Tr. 97). His reported height was 6'1". (Tr. 242). He previously worked as an operator/oiler, an installer, and a welder. (Tr. 230). Plaintiff submitted a function report around November 2014 stating that he could no longer stand, walk, or crouch well. He reported that he had a limited range of motion, had trouble breathing, and was in constant pain. He did very little if any of his daily household tasks, but did acknowledge the ability to take care of his household pet and shop for groceries. (Tr. 257-265).

2.  **Evidentiary Hearing**

At the evidentiary hearing, plaintiff reported that he weighed 480 pounds. (Tr. 62). He was divorced and lived alone. He completed the majority of the daily household tasks, but only in 8 to 10 minute increments. (Tr. 65-66). His insurance lapsed in 2016. (Tr. 60).

Plaintiff said he could not work because he could not be on his feet or sit upright for a very long time due to the pressure it put on his joints. (Tr. 63). Plaintiff stated that he could possibly walk 10 or 15 yards, but would have to lay down afterwards because of the induced pain associated. (Tr. 65). He noted that he could go grocery shopping, but he had to take breaks from walking in the store

and had to have someone there to help him with heavier items.   (Tr. 66, 70).

A VE also testified.   As there is no issue as to his testimony, it will not be summarized.

### 3.    Medical Records

In 2010, 2011, and 2012, plaintiff saw Dr. Charles Neal, his family doctor. In 2010, Dr. Neal gave plaintiff a physical examination and looked at his right knee. Dr. Neal determined that plaintiff had internal derangement of his right knee and right knee pain.   Dr. Neal prescribed naproxen sodium and continued plaintiff on Vicodin and Ultram.   (Tr. 309).   In his 2011 visit, plaintiff complained of lower back pain, with Dr. Neal noting that he had a history of chronic back pain. Dr. Neal prescribed Valium and continued plaintiff on Ultram and naproxen sodium.   (Tr. 306-307).   Dr. Neal last saw plaintiff in 2012, when plaintiff was diagnosed with conjunctivitis.   (Tr. 303).

Plaintiff saw Dr. Raymond Leung in 2014 for a consultative exam. According to the record, plaintiff had a history of AS and rheumatoid arthritis (RA). Dr. Leung noted that plaintiff walked with a forward bend, was morbidly obese, and had shortness of breath.   He also reported that plaintiff could lift a maximum of 10 to 15 pounds, could walk a block, could tandem walk, toe walk, and heel walk, but could not hop or squat.   (Tr. 317).   Dr. Leung further stated that plaintiff had a reduced range of motion in his knees, ankles, shoulders, cervical spine, and lumbar spine.   (Tr. 319).   Plaintiff saw Dr. Leung again later that year and noted that he could now only walk half a block, but did have an increased maximum lift of

25 to 30 pounds.  (Tr. 335).

On May 11, 2015, plaintiff started care with Dr. Daniel Hoffman, an internist, who he continued to see throughout 2015, 2016, and 2017.  Plaintiff told Dr. Hoffman that he had a lot of generalized joint pain and Tylenol, ibuprofen, and naproxen sodium were no longer providing any relief.  Dr. Hoffman found that plaintiff also had shortness of breath and ankle edema.  (Tr. 615).  Plaintiff also reported drinking two and a half fifths of rum weekly and smoking a quarter of a pack of cigarettes daily.  (Tr. 616).  Dr. Hoffman prescribed meloxicam to plaintiff.  (Tr. 423).

On June 5, 2015, plaintiff was admitted to the hospital for chest pain and shortness of breath.  Plaintiff was discharged three days later, and his discharging physician prescribed amiodarone, digoxin, furosemide, lisinopril, metoprolol and warfarin.  (Tr. 422-423).  Later that month and again in July 2015, plaintiff returned to the hospital and was discharged with diagnoses of atrial fibrillation, cardiomyopathy, chest pain, and hypertension.  His physician continued him on amiodarone, furosemide, lisinopril, metoprolol, and warfarin.  (Tr. 453-455, 488, 493).  Plaintiff was admitted to the hospital again in August, September, October, and December 2015.  (Tr. 501, 515, 521, 543).

On June 28, 2016, Dr. Hoffman completed a form to assess plaintiff's ability to do work-related activities.  He limited plaintiff to sedentary work in the assessment.  Dr. Hoffman also stated that plaintiff would require an hour or more of extra breaks during an 8-hour workday, that he would be absent once per month,

and that he should avoid even moderate exposure to wetness, humidity, and extremes of heat and cold. (Tr. 342-344).

Plaintiff also sought treatment from Dr. David Knapp, a rheumatologist, in 2015. On his first visit, Dr. Knapp diagnosed plaintiff with AS of multiple sites in the spine. (Tr. 545). He noted plaintiff's family history of RA; assigned a pain score of 6, and later, 7; found plaintiff had a marked limitation of spinal motion; and stated that he believed plaintiff's joint and spine issues were both mechanical and inflammatory. (Tr. 546, 549-550, 555). He remarked that plaintiff was unable to work because his joints and spine would flare up. He also observed that plaintiff appeared to have pulmonary problems and shortness of breath. (Tr. 549-550). On another visit, Dr. Knapp noted that plaintiff tested negative for RA or other inflammatory processes, however, he stated that plaintiff could still benefit from a biologic medication for his joints. (Tr. 557). Plaintiff was eventually prescribed methotrexate and the biologic drug Humira by an associate of Dr. Knapp's, Dr. Mehwish Khan. (Tr. 648). Dr. Khan found many of the same problems as Dr. Knapp and assigned plaintiff a varying degree of pain scores throughout his visits. (Tr. 565, 646, 651, 660, 690).

In January 2015, state medical examiner Dr. Julio Pardo reviewed plaintiff's medical records, evaluated him, and diagnosed him with inflammatory arthritis, AS, and obesity. (Tr. 99). Dr. Pardo found that plaintiff was restricted from climbing ladders, ropes, and scaffolds; lifting more than 50 pounds; standing or walking for more than six hours total in a day; and sitting for more than six hours

total in a day. (Tr. 100-1011). Dr. Pardo concluded that plaintiff was not disabled and could perform the functions of occupations that require light work. (Tr. 103-104). In June 2015, state medical examiner Dr. Lenore Gonzalez reviewed petitioner's medical records and also concluded that plaintiff was not disabled and could perform the functions of occupations that require light work. (Tr. 111-114).

## Analysis

ALJ Aliberti determined that plaintiff's residual functional capacity was lower than both state medical examiners' findings, while also simultaneously agreeing with the determination of one of plaintiff's treating physicians. And that does give this Court pause as to the claims of the plaintiff here. Creating even more pause is the ALJ's sound reasoning in addressing the bulk of the voluminous medical opinions in this case.

That said, plaintiff argues that the ALJ did not adequately explain his rejection of plaintiff's treating physicians' opinions in his written decision. A treating physician's opinion is entitled to "controlling weight" if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and if it is consistent with other substantial evidence in the record. 20 C.F.R. § 416.927(c)(2); *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010). An ALJ who chooses to reject a treating physician's opinion must provide a good reason for the rejection. *Ibid.*

When an ALJ decides to favor another medical professional's opinion over

that of a treating physician, the ALJ must provide an account of what weight the treating physician's opinion merits. 20 C.F.R. § 404.1527(c)(2)-(5); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). Specifically, the ALJ must evaluate the opinion in light of (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. *Ibid.* The ALJ's decision failed to meet these requirements for rejecting the opinions of plaintiff's treating physicians.

The deficiency in the ALJ's decision here is that it wholly omitted any consideration of Dr. Knapp and Dr. Khans' opinions and, therefore, any merit those opinions may contain. Apparently lacking any defense for the deficiencies in the ALJ's decision, the Commissioner also ignored the opinions of these two physicians. (Doc. 20). Dr. Knapp's assessments, however, addressed plaintiff's symptoms and some of his functional capacity and thus were relevant to several parts of the ALJ's analysis. Dr. Knapp assessed plaintiff with AS of multiple sites in the spine and arthritic problems of the joints and spine, then described his marked limitations in spinal motion and flare up of the of the joints and spine. He also offered the opinion that plaintiff was unable to work because his joints and spine would flare up. Dr. Khan found many of these same issues. Dr. Knapp and Dr. Khan also both assigned plaintiff with a pain scores varying from 4 all the way

up to 7. Simply stated, the ALJ ignored treating physicians' opinions without providing any reason and consequently, did not comply with the regulations and well-established case law of this Circuit. See, *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982).

Furthermore, under SSR 16-3p, which became effective March 16, 2016, the ALJ must carefully consider the entire case record and evaluate the "intensity and persistence of an individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 16-3p, 2016 WL 1119029 at *2. The ALJ must first determine whether a claimant has a medically determinable impairment that could reasonably be expected to produce her symptoms. *Ibid.* Then, the ALJ must evaluate the "intensity, persistence and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." *Ibid.* Whenever an individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding based on a consideration of the entire case record, including "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Ibid.* at *5.

Here, the ALJ concluded that the objective medical evidence indicated that

plaintiff's impairments could reasonably be expected to cause his alleged symptoms. Nevertheless, using language the Seventh Circuit has called "even worse" than "meaningless boilerplate," the ALJ concluded that plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." See *Bjornson v. Astrue,* 671 F.3d 640, 645–46 (7th Cir. 2012); see also *Brindisi v. Barnhart,* 315 F.3d 783, 787–88 (7th Cir. 2003). Although the use of this language alone does not warrant remand, remand is appropriate here because the ALJ's remaining credibility analysis fails to build the required logical bridge between the evidence and the conclusion that her testimony was not credible.

While the ALJ did detail some of plaintiff's subjective symptom allegations, he misrepresented some of plaintiff's limitation testimony and explained away other parts by alleging that plaintiff did not comply with treatment. (Tr. 39-40). Indeed, "where the claimant does not have a good reason for the failure or infrequency of the treatment," failure to follow a treatment plan can support an ALJ's determination that a claimant was not credible. *Craft v. Astrue,* 539 F.3d at 679 (citing SSR 96–7p). Importantly, though, no such inference can be made "unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Ibid.* The ALJ did not explore those explanations.

Additionally, although an ALJ can appropriately consider a claimant's daily activities when assessing the claimant's symptoms, *Craft,* 539 F.3d at 680, an ALJ

plaintiff's impairments could reasonably be expected to cause his alleged symptoms. Nevertheless, using language the Seventh Circuit has called "even worse" than "meaningless boilerplate," the ALJ concluded that plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." See *Bjornson v. Astrue,* 671 F.3d 640, 645–46 (7th Cir. 2012); see also *Brindisi v. Barnhart,* 315 F.3d 783, 787–88 (7th Cir. 2003). Although the use of this language alone does not warrant remand, remand is appropriate here because the ALJ's remaining credibility analysis fails to build the required logical bridge between the evidence and the conclusion that her testimony was not credible.

While the ALJ did detail some of plaintiff's subjective symptom allegations, he misrepresented some of plaintiff's limitation testimony and explained away other parts by alleging that plaintiff did not comply with treatment. (Tr. 39-40). Indeed, "where the claimant does not have a good reason for the failure or infrequency of the treatment," failure to follow a treatment plan can support an ALJ's determination that a claimant was not credible. *Craft v. Astrue,* 539 F.3d at 679 (citing SSR 96–7p). Importantly, though, no such inference can be made "unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Ibid.* The ALJ did not explore those explanations.

Additionally, although an ALJ can appropriately consider a claimant's daily activities when assessing the claimant's symptoms, *Craft,* 539 F.3d at 680, an ALJ

"cannot disregard a claimant's limitations in performing household activities." *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (citations omitted). In this case, the ALJ did not discuss how plaintiff was limited to household chores in 8 to 10 minute intervals. Also, although ALJ discussed plaintiff's ability to grocery shop, he did not discuss the plaintiff's inability to grocery shop alone, or the breaks he had to take while walking in-store. The ALJ created a veil of independence for the plaintiff that does not appear to exist when the record is viewed *in toto*.

The lack of discussion of these subjective allegations, along with the lack of discussion of treater opinions, requires remand. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (internal citation omitted).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled, or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## **Conclusion**

The Commissioner's final decision denying plaintiff's application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   March 1, 2019.**

                                                  **s/ Clifford J. Proud**
                                                  **CLIFFORD J. PROUD**
                                                  **UNITED STATES MAGISTRATE JUDGE**